Douglas P. Farr (13208)
Jacob D. Barney (16777)
**BUCHALTER, P.C.**
111 S Main St., Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 401-8625
dfarr@buchalter.com
jbarney@buchalter.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH, SOUTHERN DIVISION**

| | |
|---|---|
| **PAPARAZZI, LLC** d/b/a **PAPARAZZI ACCESSORIES, LLC**, a Utah limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>**MELISSA SORENSON**, an individual, **GERALDINE SOUZA**, an individual, **KYLEE ROBINETTE**, an individual, **MORGAN FERGUSON**, an individual, **JENNIFER DYER**, an individual, **JAIME ROBINSON**, an individual, **JENNIFER CARROL**, an individual, **KIMBERLY DREWRY**, an individual, and **JOHN AND JANE DOES I-X.**<br><br>Defendants. | **APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Case No. 4:22-cv-00028-DN<br><br>District Judge David Nuffer |

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Paparazzi, LLC d/b/a Paparazzi Accessories, LLC ("**Paparazzi**"), by and through its undersigned counsel, hereby asks the Court to issue a temporary restraining order and preliminary injunction enjoining Paparazzi's former

employee, Defendant Melissa Sorenson ("**Sorenson**"), as well as Paparazzi's former consultants, Defendants Geraldine Souza ("**Souza**"); Kylee Robinette ("**Robinette**"); Morgan Ferguson ("**Ferguson**"); Jennifer Dyer ("**Dyer**"); Jaime Robinson ("**Robinson**"); Jennifer Carroll ("**Carroll**"); and Kimberly Drewry ("**Drewry**") (collectively, the "**Ex-Consultant Defendants**") from further accessing or using Paparazzi's confidential and privileged information for any purpose. Paparazzi also seeks expedited discovery.

I. **SUMMARY OF REQUESTED RELIEF**

Paparazzi respectfully requests that the Court enter a temporary restraining order ("**TRO**") without notice, and, subsequently, a preliminary injunction ("**PI**"), enjoining Sorenson and the Ex-Consultant Defendants from further accessing, maintaining, or sharing Paparazzi's confidential business records.

Shortly after her employment at Paparazzi was terminated, Sorenson was added to a Facebook Messenger group chat titled Papa Chat United (the "**Group Chat**"). The Ex-Consultant Defendants created and organized the Group Chat in order to compile and share Paparazzi's confidential business records. The Ex-Consultant Defendants did so with the express purpose of trying to interfere with, and disrupt, Paparazzi's business operations. The Ex-Consultant Defendants made the Group Chat secret and controlled who had access to the messages in the Group Chat.

On or about February 24, 2022, Sorenson sent a message in the Group Chat explaining that she still had access to Paparazzi's confidential business databases through a login she improperly retained that provided unauthorized access through a Paparazzi administrative account (the "**Paparazzi Admin Account**"). Upon learning about Sorenson's ability to obtain Paparazzi's confidential business records, the Ex-Consultant Defendants conspired and

2

encouraged Sorenson to illegally obtain as much confidential information as she could before Paparazzi discovered the access.

Recently, Paparazzi obtained copies of pages of messages exchanged between the Defendants. Paparazzi discovered that Defendants had conspired for months to, and in fact had, obtain access to Paparazzi's confidential information, including, but not limited to, customer lists, consultant information, financial data, commission payments, etc. Sorenson's access and sharing of Paparazzi's confidential business records is an express violation of the Confidential Information and Non-Competition Agreement ("**Confidentiality Agreement**") Sorenson executed when she was hired. Pursuant to the Confidentiality Agreement, Sorenson's breach allows Paparazzi to obtain injunctive relief to stop further access and sharing of Paparazzi's confidential information. Moreover, Defendants' intentional interference with Paparazzi's economic relationships, including their conspiracy to steal Paparazzi's confidential information, and Defendants' efforts to harm Paparazzi are appropriate grounds for the Court to grant preliminary and permanent injunctive relief.

Accordingly, Paparazzi requests entry of a TRO without notice in order to protect Paparazzi from further harm and disruption. Regardless, Paparazzi shall email a copy of this motion to each Defendant, at their last known email address.

## II. FACTUAL ALLEGATIONS

*Paparazzi's Business and the Confidentiality Agreement*

1. Paparazzi is a fashion accessory wholesaler headquartered in Utah with sales people ("**Consultants**") operating across the United States. (*See* Verified Compl., ¶ 12.)

2.  Certain Paparazzi employees (not Consultants) must agree to, and execute, Paparazzi's Confidentiality Agreement. A copy of the Confidentiality Agreement is attached hereto as **Exhibit A**.

3.  On August 20, 2019, Defendant Sorensen acknowledged, and executed, the Confidentiality Agreement when she was hired to work at Paparazzi's corporate offices. The following is a screenshot from Paparazzi's electronic business records evidencing Sorenson's acknowledgement:



4. Section 1(a) of the Confidentiality Agreement states, in part:

> I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the exclusive benefit of the Company, or to disclose to any person, firm or entity without written authorization of an authorized officer of the Company (other than myself), and Confidential Information of the Company. I understand that "Confidential Information" means any non-public information [including]: Company proprietary information . . . [or] trade secrets or know-how, including but not limited to, research plan, research results, processes, designing, methods, compositions, employment procedures, business plans, marketing plans, product plans, products, services, suppliers, distributor or Consultant lists or data, and Consultants (including, but not limited to, Consultants of the Company on whom I call or with whom I become acquainted during the terms of my service on behalf of the Company), markets, software, specifications, inventions, operations, procedures, compilations or data, technology, designs, finances or other business information disclosed to me by the Company, either directly or indirectly in writing, orally, or by drawings or observation.

(Ex. A, at 1).

5. Paparazzi's confidential, protected information includes, but is not limited to, all information regarding consultants, operations, finances, etc. (the "**Confidential Information**").

(*Id.*)

6. Section 1(b) of the Confidentiality Agreement includes, in part, the following acknowledgment:

> I acknowledge that during my employment with the Company, I will have access to Confidential Information, all of which shall be made accessible to me only in strict confidence; that unauthorized disclosure of Confidential Information will damage the Company's business; and that the restrictions contained in this agreement are reasonable and necessary for the protection of the Company's legitimate business interest.

(*Id.*)

7. Section 1(c) of the Confidentiality Agreement includes, in part, the following provisions regarding third-party information:

I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

(*Id.* at 1–2.)

8. Section 3(c) of the Confidentiality Agreement provides, in part, the following provision concerning survival of the Confidentiality Agreement after an employee's termination:

My obligations under this agreement shall survive the termination of my employment with the Company and shall thereafter be enforceable whether or not such termination is claimed or found to be wrongful or to constitute or result in a breach of any contract or of any other duty owed or claimed to be owed to me by the Company or any Company employee, agent, or contractor.

(*Id.* at 3.)

9. Section 5 of the Confidentiality Agreement provides, in part, the following provisions concerning remedies for breach of the Confidentiality Agreement:

I acknowledge that any violation of this Agreement will cause the Company immediate and irreparable harm and that the damages which the Company will suffer may be difficult or impossible to measure. Therefore, upon any actual or impending violation of this Agreement, the Company will be entitled to the issuance of a restraining order, preliminary and permanent injunction, without bond, restraining or enjoining such violation by me or any entity or person acting in concert with me. This remedy will be in addition to, and not in limitation of, any other remedy which may otherwise be available to the Company. Moreover, if I breach, or threaten to commit a breach of my duty to maintain the confidentiality of the confidential information revealed by the Company, the following rights remedies, each of which rights and remedies will be in addition to, and no in lieu of, any other rights and remedies available to the Company at law or equity:

   a. <u>Specific Performance</u>. The right and remedy to have the duty of confidentiality specifically enforced by any court having equity jurisdiction, all without the need to post a bond or any other security, or to provide an adequate remedy, it being acknowledged and agreed that any

6

such breach or threatened breach will cause irreparable injury to the Company and that monetary damages will not provide an adequate remedy to the Company.

    b. <u>Accounting and Indemnification</u>. The right and remedy to require me;

        . . .

        ii. To indemnify the Company against any other losses, damages (including special and consequential damages, costs and expense, including actual attorney's fees and course costs), which may be incurred by the Company and which result from, or arise out of, any breach or threatened breach of the duty of confidentiality.

(*Id.* at 4–5.)

*Facebook Messenger Group Chat*

10. On or about February 14, 2022, Sorensen became part of a Facebook Messenger group chat titled Papa Chat United (the "**Group Chat**") after her employment at Paparazzi was terminated. (Verified Compl., ¶ 25.) Screenshots of the messages in the Group Chat are attached hereto as **Exhibit B**.

11. Upon information and belief, the Group Chat was organized by the Ex-Consultant Defendants for the express purpose of organizing efforts to harass and harm Paparazzi. (*Id.* at ¶ 26.)

12. Upon information and belief, the Group Chat was used as a means for Ex-Consultant Defendants to communicate with Sorenson about stealing confidential Paparazzi documents and information, including information which is defined as Confidential Information pursuant to the Confidentiality Agreement. (*Id.* at ¶ 28.)

13. On February 24, 2022, Sorenson sent a message to the Group Chat explaining that, when she was fired, Paparazzi shut down her lines of business communication, including

access to Paparazzi's databases, company email, and other Paparazzi owned and controlled programs and information. (*Id.* at ¶ 30; Ex. B, at 8.)

14. Despite acknowledging that Paparazzi had clearly revoked her access to its databases, Sorenson explained that she had improperly retained access to a corporate administration account, which Paparazzi had not shut down following Sorenson's termination ("**Paparazzi Admin Account**"). (Verified Compl., at ¶ 31; Ex. B, at 8.)

15. Sorenson reported in the Group Chat that she could login to Paparazzi's confidential databases through the Paparazzi Admin Account. (Verified Compl., at ¶ 32; Ex. B, at 8–9.)

16. Upon learning of Sorenson's improper and illegal access to the Paparazzi Admin Account, Ex-Consultant Defendants conspired, encouraged, and worked with Sorenson to use the improperly retained login information to access and share Paparazzi's Confidential Information. (Verified Compl., at ¶ 33; *see generally* Ex. B.)

17. For example, Souza directly asked Sorenson: "with your sign in is there anything you think we can get before they lock you out?" (Verified Compl., at ¶ 34; Ex. B, at 10.)

18. Souza also asked Sorenson: "On that access you have There [sic] isn't anyway you can tell how many active consultants there are?" (Verified Compl., at ¶ 35; Ex. B, at 16.)

19. From these messages and others, it is clear that Souza and the other Ex-Consultant Defendants wanted to get their hands on as much Confidential Information as they could through Sorenson's unauthorized access to the Paparazzi Admin Account. (Verified Compl., at ¶ 36.)

20. After further investigation, Sorenson reported in the Group Chat that she could "access any [Paparazzi] docs they put out for consultants as well as any current consultants [sic]

accounts including[,] well[,] everything on the account. [Including] new releases they will be putting out for the day." (Verified Compl., at ¶ 37; Ex. B, at 10.)

21. In an effort to protect herself and her co-conspirators, Sorenson explained in the Group Chat that she would "spoof" her IP address and use a VPN to avoid getting caught by Paparazzi. (Verified Compl., at ¶ 38; Ex. B, at 11, 22.)

22. Clearly, Sorenson and the Ex-Consultant Defendants knew their access of the Confidential Information was improper and illegal. (Verified Compl., at ¶ 39.)

23. Wanting to provide even more assistance, Sorenson said she would "see if [she could] find out [other Confidential Information] from someone who still works there.. [sic] she has access to the info and [Sorenson could] randomly bring it up somehow". (Verified Compl., at ¶ 40; Ex. B, at 17.)

24. Ex-Consultant Defendants conspired with Sorenson to access Confidential Information regarding numerous active Paparazzi consultants. (Verified Compl., at ¶ 41; Ex. B, at 13–14, 17–35.)

25. Sorenson then accessed, downloaded, and shared vast amounts of Confidential Information with the Ex-Consultant Defendants in the Group Chat, including the total number of Paparazzi consultants, customers, consultant profiles, and active consultants that she stole from the Paparazzi computer database. (Verified Compl., at ¶ 42; Ex. B, at 17–35.)

26. Sorenson accessed and shared Paparazzi's financial data and information including information relating to sales and commission reports. (Verified Compl., at ¶ 43.)

27. Sorenson shared information regarding Paparazzi's business operations and processes, including operations relating to some of Paparazzi's active Consultants. (Verified Compl., at ¶ 44; Ex. B, at 17–21.)

9

28. Sorenson shared multiple iPhone screen recordings with the Ex-Consultant Defendants in the Group Chat that disclosed Paparazzi's Confidential Information. (Verified Compl., at ¶ 45; Ex. B, at 18–35.)

29. Sorenson also emailed "large files" to the Ex-Consultant Defendants, which contained Confidential Information, including commission totals for many active Consultants. (Verified Compl., at ¶¶ 46–47; Ex. B, at 27–28.)

30. Sorenson and the Ex-Consultant Defendants shared the Confidential Information that Sorenson accessed, downloaded, and disclosed with other people. (Verified Compl., at ¶ 48.)

31. Sorenson and the Ex-Consultant Defendants did so to try and harm and disrupt Paparazzi's business, including, for example, its operations and its contractual relationships with its Consultants. (*Id.* at ¶ 49.)

32. Paparazzi never authorized nor permitted Defendants' improper and illegal access of Paparazzi's Confidential Information. (*Id.* at ¶ 50.)

33. And Paparazzi never authorized nor permitted Defendants to share the Confidential Information via the internet. (*Id.* at ¶ 51.)

34. At all times, Defendants acted in secret, and in such a way as to prevent Paparazzi from learning of their unlawful actions. (*Id.* at ¶ 52.)

35. In fact, at one point in the Group Chat, Sorenson even asked "just to make sure.. no one is ever going to know where these came from correct? . . . like no one will ever know how they were obtained." Defendant Carrol responded: "Never". (Verified Compl., at ¶¶ 53–54; Ex. B, at 27.)

## III. ARGUMENT

"To merit a temporary restraining order or preliminary injunction, the movant must establish that (1) [it] has a substantial likelihood of prevailing on the merits; (2) [it] will suffer irreparable injury if [it] is denied the injunction; (3) [its] threatened injury outweighs the injury that the opposing party will suffer under the injunction; and (4) an injunction would not be adverse to the public interest." *Wiechmann v. Ritter*, 44 F. App'x 346, 347 (10th Cir. 2002).

### a. Paparazzi Is Likely to Prevail on Its Claims.

In addition to its claim for injunctive relief, Paparazzi asserts the following causes of action: (i) breach of the Confidentiality Agreement against Sorenson, including a breach of the implied covenant of good faith and fair dealing; (ii) intentional interference with economic advantage against all Defendants; (iii) civil conspiracy against all Defendants; and (iv) violation of the federal Fraud and Computer Abuse Act (the "**Act**"). As detailed more fully below, Paparazzi is likely to prevail on the merits of these claims.

#### i. Sorenson breached the Confidentiality Agreement.

Paparazzi will prevail on its claim against Sorenson for her breach of the Confidentiality Agreement. "In Utah, the necessary elements of a breach of contract claim are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Hiatt v. Brigham Young Univ.*, 512 F. Supp 3d 1180, 1184 (D. Utah 2021) (internal quotation marks and citation omitted).

Here, Sorenson acknowledged and executed the Confidentiality Agreement on August 20, 2019. (Verified Compl., ¶ 18.) Sorenson executed the Confidentiality Agreement as part of her employment with Paparazzi. (*Id.* at ¶ 16.) Paparazzi performed under the Confidentiality Agreement by providing employment and pay to Sorenson as well as granting Sorenson access to

11

certain Confidential Information during her employment. (*Id.* at ¶ 63.) Pursuant to the Confidentiality Agreement, Sorenson agreed to hold Paparazzi's Confidential Information "in strictest confidence" and agreed "not to use [it], except for the exclusive benefit of [Paparazzi], or to disclose to any person, firm or entity . . . Confidential Information of [Paparazzi]." (Ex. A, at § 1(a).) Confidential Information is defined as "proprietary information . . . including but not limited to . . . employment procedures, . . . distributor or Consultant lists or data, and Consultants . . . operations, procedures, compilations or data, . . . finances or other business information disclosed to me . . . ." (*Id.*)

Moreover, Sorenson acknowledged that during her employment with Paparazzi she would be given access to Confidential Information, but she agreed "that unauthorized disclosure of Confidential Information will damage [Paparazzi's] business." (*Id.* at § 1(b).) Sorenson agreed that her obligations under the Confidentiality Agreement "survive the termination of [her] employment with [Paparazzi]." (*Id.* at § 3(c).) And Sorenson acknowledged "that any violation of this [Confidentiality] Agreement will cause [Paparazzi] immediate and irreparable harm" and that in the event Sorenson violated the Confidentiality Agreement, Paparazzi "will be entitled to the issuance of a restraining order, preliminary and permanent injunction, without bond, restraining or enjoining such violation by me or any entity or person acting in concert with me." (*Id.* at § 5.)

Sorenson breached the Confidentiality Agreement when she improperly and illegally accessed Paparazzi's confidential databases after she was terminated. More specifically, Sorenson accessed, downloaded, and shared vast amounts of Confidential Information with the Ex-Consultant Defendants, including the total number of Paparazzi consultants, customers, consultant profiles, commission information, and other financial data. (Verified Compl., at ¶¶

42–48; Ex. B, at 17–35.) Sorenson's breach has damaged Paparazzi, in an amount to be determined at a later date, by accessing and sharing this information. But Paparazzi must stop Sorenson and the Ex-Consultant Defendants from further injuring Paparazzi and its business operations. Accordingly, Paparazzi brings this motion seeking immediate entry of a TRO, without notice, to stop Defendants from accessing and utilizing Paparazzi's Confidential Information.

### ii. Defendants intentionally interfered with Paparazzi's business.

Similarly, Paparazzi will prevail on its claim against Defendants for their intentional interference with Paparazzi's economic relations. "To establish a prima facie case of intentional interference with existing and potential economic relations, a plaintiff must allege: (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *IHC Health Servs. Inc. v. ELAP Servs., LLC*, 2018 WL 4688358, *3 (D. Utah Sept. 28, 2018) (cleaned up).

Here, Defendants intentionally and knowingly obtained Paparazzi's Confidential Information with the intent to cause harm and injury to Paparazzi. For example, Sorenson disclosed to the Ex-Consultant Defendants that although she had been terminated she still had access to the Paparazzi Admin Account and could access Paparazzi's Confidential Information. (Verified Compl., at ¶¶ 30–31; Ex. B, at 8.) Defendants understood that Sorenson was not permitted or authorized to access this data. As a result, Sorenson explained that she would spoof her IP address and use a VPN to avoid being detected by Paparazzi. (Verified Compl., at ¶ 38; Ex. B, at 11, 22.) Knowing this, the Ex-Consultant Defendants still conspired with Sorenson to access Confidential Information regarding numerous active Paparazzi consultants. (Verified Compl., at ¶ 41; Ex. B, at 13–14, 17–35.) And the Ex-Consultant Defendants told Sorenson there

13

was no way that Paparazzi would ever discover who accessed the Confidential Information illegally. (Verified Compl., at ¶¶ 53–54; Ex. B, at 27.)

Accordingly, Defendants actions were done via improper means. *See IHC Health Servs., 2018 WL 4688358 at \*3* ("The improper-means requirement is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common-law rules."). Defendants engaged in improper means by encouraging Sorenson to violate the Act and her contractual obligations by illegally accessing Paparazzi's Confidential Information. These intentional and improper means has damaged Paparazzi as their Confidential Information has been accessed, downloaded, and shared with unauthorized recipients.

Paparazzi will prevail on its intentional interference claim, and, as a result, injunctive relief is appropriate.

### iii. Defendants conspired against Paparazzi.

Paparazzi also will prevail on its civil conspiracy claim against Defendants. "In order to plead a claim or civil conspiracy, a complaint must allege sufficient facts to establish "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Harvey v. Ute Indian Tribe of Uintah and Ouray Reservation*, 2017 UT 75, ¶ 70, 416 P.3d 401.

As detailed herein, Defendants' objective was to obtain as much of Paparazzi's financial and proprietary information with regard to Paparazzi's customers, consultants, commission payments, and enforcement of its policies and procedures. Defendants' collective objective was to disclose this data in order to cause harm to Paparazzi and its business. In accomplishing this

objective, Defendants used illegal means, including by violating the Act and aiding and abetting in violating the Act. Defendants' actions have cause direct damage to Paparazzi.

### iv. Sorenson violated the Act.

Finally, Paparazzi will succeed on its claim against Sorenson for her violation of the Act. The Act provides a number of grounds for civil liability, which include instances in which an actor:

> [I]ntentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer; . . . knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value; [or] ... intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage[,] or ... causes damage and loss.

[18 U.S.C. §§ 1030(a)(2)(C), (4), (5)(B)-(C)](.).

The verified facts evidence that Sorenson (at the Ex-Consultant Defendants' encouragement) intentionally assessed Paparazzi's computer servers without authorization with an intent to defraud and injure Paparazzi. And Sorenson's violation of the Act did, in fact, cause damage to Paparazzi as she shared the Confidential Information with the Ex-Consultant Defendants, and such information has been further disclosed to an unknown number of other individuals, and, potentially, competitors. Sorenson's own messages in the Group Chat provide clear support that she knowingly and intentionally accessed Paparazzi's Confidential Information—knowing she was not authorized to do so—in order to aid all Defendants in their quest to cause harm to Paparazzi. These actions are clear violations of the Act.

### b. **Defendants' Conduct Is Causing Paparazzi Irreparable Harm.**

As expressly provided in the Confidentiality Agreement, and as courts have repeatedly held, "[i]rreparable injury may include different types of losses that are often difficult to

quantify, including lost sales and erosion in reputation and brand distinction." *In re BRCA1-, BRCA2-Based Hereditary Cancer Test Patent Litig.*, 3 F. Supp. 3d 1213, 1249 (D. Utah), *aff'd and remanded sub nom. In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.*, 774 F.3d 755 (Fed. Cir. 2014); *Hunsaker v. Kersh*, 1999 UT 106, ¶ 10, 991 P.2d 67, 70 ("Loss of business and goodwill may constitute irreparable harm susceptible to injunction."); *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986) ("A threat to trade or business viability may constitute irreparable harm.").

Here, Defendants' actions have caused and continue to cause Paparazzi irreparable harm. Some Consultants have reached out to Paparazzi with concern that their confidential personal information, including addresses, contact details, financial information, and Paparazzi commission payments have been accessed and shared outside of Paparazzi's business operations. These concerns cause reputational and loss of goodwill, and are fueled by Defendants' improper and illegal acts. In fact, there is a risk that some Consultants could cancel their contractual relationship with Paparazzi based on Defendants' improper disclosure of Confidential Information. Such harm cannot readily be reduced to monetary damages. Thus, given this irreparable harm and the threat it poses to Paparazzi's business, the Court should enter a TRO, without notice, and a PI.

### c. **Paparazzi's Injuries Grossly Outweigh Any Threat to Defendants.**

A TRO and PI is appropriate here because Paparazzi's injury grossly outweighs any injury to Defendants. And any injury Defendants may suffer is a direct result of their own actions. Courts generally recognize that a party against whom an injunction is sought cannot claim an "irreparable injury" from self-inflicted harm. *See, e.g., Telestrata, LLC v. NetTALK.com, Inc.*, 126 F. Supp. 3d 1344, 1355 (S.D. Fla. 2015) ("[I]n considering the potential

16

harm to a non-movant, a court may discount potential harm that would arise due to the actions of the non-movant."); *MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, (D.N.J. 2008) ("The injury a nonmoving party might suffer if an injunction is granted should be discounted if there are any facts indicating that the injury was self-inflicted."); *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990) (a party "can hardly claim to be harmed [where] it brought any and all difficulties occasioned by the issuance of an injunction upon itself").

Here, Defendants will not suffer any harm because they have no interest in continuing their wrongful and unlawful conduct. They put themselves in the position of misusing Paparazzi's Confidential Information, so any harm they suffer from entry of a TRO and PI will come as a result of their own making. But to the extent there is a possibility of legitimate harm to Defendants, it is grossly outweighed by the harm being suffered by Paparazzi as their hard-earned customer and Consultant relationships have been injured as a result of Defendants' misuse of Paparazzi's Confidential Information.

### d. Neither the TRO Nor PI Are Adverse to the Public Interest.

The law and public policy recognize the importance of protecting businesses' confidential information, including proprietary information such as customer and Consultant lists. 18 U.S.C. § 1836 (providing for injunctive relief); Utah Code § 13-24-3 (same). Courts and other authorities have found that sound policy dictates the entry of injunctive relief in cases involving the misappropriation of Confidential Information, including proprietary information. *See InnoSys, Inc. v Mercer*, 364 P.3d 1013, ¶¶ 34-36 (Utah 2015); *see also* 2 Rudolf Callmann, CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 14:39 (4th ed. 2015) (explaining that "[a] remedy at law normally is inadequate" in cases of misappropriation of

proprietary information, and noting that "an injunction is a proper response of equity"); 4 Dan B. Dobbs, et al., THE LAW OF TORTS, § 739 ("[W]here future revelation is threatened, the owner may frequently obtain an injunction"); *Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd., 5 Misc.3d 285, 783 N.Y.S.2d 758, 772 (2004)* (same).

This case involves Defendants' misappropriation of proprietary information and Confidential Information, and the use of this information by Defendants. The public interest is served by requiring former employees and former Consultants to honor their contractual and legal obligations to not illegally access confidential business records. Accordingly, there are no legitimate arguments that an injunction here would be adverse to the public interest.

### e. No bond is required under these circumstances.

Finally, the Court should issue the TRO and PI without security from Paparazzi because Defendants will suffer no damage as a result of entry of a TRO and PI. Moreover, the Confidentiality Agreement expressly provides that since breach of the Confidentiality Agreement will cause "immediate and irreparable harm . . . [that] may be difficult or impossible to measure", Paparazzi "will be entitled to the issuance of a restraining order, preliminary or permanent injunction, without bond." (Ex. A, at § 5.) Therefore, the Court should enter the TRO without requiring security or a bond from Paparazzi.

### IV. COUNSEL'S CERTIFICATION

Pursuant to Federal Rule of Civil Procedure 65(b)(1)(B), Paparazzi's undersigned counsel hereby certifies that copies of the *Verified Complaint* and this *Application and Motion for a Temporary Restraining Order and Preliminary Injunction* were emailed directly to each of the Defendants at the email addresses identified in the Certificate of Service below.

## V. CONCLUSION

For the reasons detailed herein, Paparazzi has satisfied the requirements of Rule 65, and, therefore, is entitled to entry of a TRO, without notice, as well as a PI prohibiting Defendants from accessing, maintaining, using, or sharing any of Paparazzi's Confidential Information. The Court should also enter an order allowing the parties to conduct expedited discovery.

**DATED:** April 25, 2022.

**BUCHALTER, P.C.**

*/s/ Douglas P. Farr*
Douglas P. Farr
Jacob D. Barney
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2022, a true and correct copy of the foregoing was served via email on the following Defendants:

| | |
|---|---|
| Melissa Sorenson<br>Msorenson2904@gmail.com | Geraldine Souza<br>feistybombshell@yahoo.com |
| Kylee Robinette<br>mariesbelleboutique@gmail.com | Morgan Ferguson<br>morgferguson@outlook.com |
| Jennifer Dyer<br>jdyer@dyermedicalbilling.com | Jaime Robinson<br>muzicluvr521@yahoo.com |
| Jennifer Carroll<br>carrollj@aberdeen58.org | Kimberly Drewry<br>paparazzikimdrewry@gmail.com |